**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

KAREN MICHELLE RAYMOND,

                              Plaintiff,

              v.                                                    No. 14-CV-1572
                                                                    (MAD/CFH)
CAROLYN W. COLVIN,
Commissioner of Social Security,

                              Defendant.

_____

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**


**APPEARANCES:**                                **OF COUNSEL:**

The Olinsky Law Group                           HOWARD D. OLINSKY, ESQ.
Attorneys for Plaintiff
One Park Place
300 S. State Street
Fifth Floor, Suite 420
Syracuse, New York 13202


Social Security Administration,                 MARIA FRAGASSI SANTANGELO, ESQ.
Office of General Counsel                        Special Assistant U.S. Attorney
Attorneys for Defendant
26 Federal Plaza - Room 3904
New York, New York 10278

**REPORT-RECOMMENDATION AND ORDER[1]**

         Plaintiff Karen Michelle Raymond ("Raymond"), brings this action pursuant to 42

U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for disability insurance benefits ("DIB") and

_____

         [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

supplemental security income ("SSI") under the Social Security Act ("Act"). Raymond

moves for a finding of disability, and the Commissioner cross-moves for a judgment on the

pleadings. Dkt. Nos. 11, 12. For the following reasons, it is recommended that this matter

be remanded for further proceedings before the Administrative Law Judge ("ALJ").

## I. Background

## A. Procedural History

Raymond, born on July 4, 1979, applied for DIB and SSI on May 31, 2012, alleging a

disability onset date of March 27, 2012. T. 142-57.[2] The applications were denied on July

17, 2012. Id. at 77-82. Raymond requested a hearing before an ALJ, and a hearing was

held on June 11, 2013. Id. at 86-87; 30-51. In a decision dated August 5, 2013, ALJ

Jennifer Gale Smith held that Raymond was not entitled to disability benefits. Id. at 17-29.

Raymond filed a timely request for review, and on October 30, 2014, the Appeals Council

denied Raymond's request, making the ALJ's findings the final decision of the

Commissioner. Id. at 1-6. This action followed.

## B. Facts

## 1. Raymond's Testimony

Raymond testified at the hearing on June 11, 2013 that she was born with a

congenital deformity on her right hand. T. 34. Her right hand is missing two fingers, and

---

[2] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. See Dkt. No. 10.

she has no wrist bones in that hand.  Id.  She is left-hand dominant.  Id.

Raymond is married, with one child.  T. 34.  She attended college for two years, taking liberal arts classes, but did not graduate.  Id. at 35.  She can write "fairly well" but has trouble with math.  Id.

Raymond testified that she relies on child support and her husband's income to survive.  T. 35.  She received unemployment benefits for a period of time, but the benefits ended before the date of the hearing.  Id.  Raymond stated that she applied for the benefits because her husband's income was not enough to provide for the family.  Id.  She received the unemployment benefits from Walmart after she was "basically fired" for being unable to lift furniture.  Id. at 35-36.  She was expected to lift up to 200 pounds, with the help of another person, but was unable to perform that task.  Id. at 36.  Prior to Walmart, she worked as a dishwasher, Rite-Aid cashier, gas station cashier, and motel clerk.  Id. at 36-38.  She also worked at a grocery store, and as a retail store cashier at Burlington Coat Factory and Sears.  Id. at 37-38.  When asked how she was able to perform the work of a Rite-Aid cashier, plaintiff stated that she used her left hand, but that she was "probably a lot slower" than the other cashiers, and that she was eventually fired for her slow pace.  Id. at 37.  As to her motel clerk position, plaintiff stated that the job was "fine" but she did not like working alone at night.  Id. at 38.  When she worked at Burlington Coat Factory and Sears, she worked in stock positions, requiring her to lift up to thirty pounds and climb ladders.  Id.  She stated that she was able to perform those tasks previously, but that she could no longer perform those same tasks.  Id.

Raymond testified that the most significant physical ailment that prevents her from

working is the pain in her back, knees, shoulders, and hips. T. 39. She also suffers from spondylitis and tendinitis. Id. at 40. The spondylitis can affect any joint in her body, but plaintiff stated that it affected her back, shoulders, hips and knees. Id. Her back pain is "constant" but her hip pain is not. Id. at 39. She is unable to drive because her neck pain prevents her from turning her head. Id. However, she stated that she could drive if necessary, but only up to a mile away. Id. at 40. At the time of the hearing, she had not driven in six months. Id.

At the time of the hearing, plaintiff was taking Simponi[3] and Methotrexate[4] for her ailments. T. 42. Raymond also takes folic acid to counteract the side effects of the Methotrexate. Id. Methotrexate causes her stomach pains if she does not take folic acid with it. Id.

Raymond stated that she can only walk half a mile before her toes become numb. T. 42-43. She can stand for thirty minutes at most. Id. at 43. She can sit for thirty minutes at most. Id. at 46 She can lift ten to twenty pounds with her right hand, and twenty to thirty pounds with her left hand, but could not lift objects for two and half hours during an eight-hour workday. Id. at 43, 47. Her right arm becomes fatigued easily. Id. at 47. She cannot reach overhead, and her husband must assist her in washing herself when she is having flare-ups. Id. The flare-ups last for about a week or two, and usually happen when she is switching medications. Id. at 46-47.

---

[3] "Simponi (golimumab) reduces the effects of a substance in the body that can cause inflammation." DRUGS.COM, http://www.drugs.com/simponi.html (last visited Mar. 3, 2016).

[4] Methotrexate is "used to treat severe psoriasis and rheumatoid arthritis." DRUGS.COM, http://www.drugs.com/methotrexate.html (last visited Mar. 3, 2016).

On a day-to-day basis, Raymond stated that her husband now has to help her button her pants because the condition of her hands has deteriorated.  T. 43.  Her daughter generally takes care of herself.  Id. at 44.  Raymond's husband cooks, grocery shops, washes the dishes, does the laundry, makes the bed, vacuums, and performs all other housework.  Id. at 44-45.  On a typical day, Raymond will bring her daughter to the school bus stop.  Id. at 45.  After, she may use the computer, then alternate between sitting on the couch or a chair.  Id.  She can only use her left hand while using the computer, and stated that she generally does not use her right hand for any tasks.  Id. at 49.  She takes a two-hour nap in the middle of the day.  Id. at 45, 48. Raymond further stated that she is always tired due to her difficulty sleeping.  Id. at 48.  She only sleeps about four hours per night, and experiences difficulty concentrating because she is usually tired and in pain.  Id.

Raymond stated that she is on "the last medicine [she] can take" for ankylosing spondylitis.[5]  T. 46.  She may need surgery in the future.  Id.

## 2.  Medical Evidence[6]

### a.  Arthritis Health Associates

Raymond was first seen by Dr. Ramzi Khairallah, M.D., at Arthritis Health Associates

---

[5]  "Ankylosing spondylitis (AS) is a systemic disorder characterized by inflammation of the axial skeleton, large peripheral joints, and digits; nocturnal back pain; back stiffness; accentuated kyphosis; constitutional symptoms; aoritis; cardiac conduction abnormalities; and anterior uveitis." THE MERCK MANUAL 341 (Robert S. Porter, M.D. & Justin L. Kaplan, M.D. eds., 19th ed. 2011).

[6]  The medical evidence is summarized below only to the extent that such evidence is relevant to the parties' contentions.  However, the Court has performed a thorough review of all medical evidence in the administrative record.

on February 15, 2012, before her disability onset date. T. 229-30. Dr. Khairallah noted that plaintiff experienced recurrent uveitis[7] one to two times per year for the previous nine years. Id. at 229. Raymond also had a history of abdominal pain and psoriasis for the past year. Id. She had previously tested positive for the HLA-B27 gene.[8] Id. Raymond complained of back and left hip pain that she experienced for the previous six months. Id. She reported morning stiffness lasting about an hour but denied swollen joints. Id. Dr. Khairallah performed a musculoskeletal examination and observed that Raymond exhibited a full range of motion in all joints, without tissue swelling or tenderness in any joint, except for the lumbosacral spine. Id. at 230. The range of motion in Raymond's lumbosacral spine was "quite limited in all directions." Id. Dr. Khairallah also noted Raymond's congenital hand malformation, observing that she was missing her fourth and fifth fingers, and her wrist bones. Id. He noted the possibility that Raymond was suffering from inflammatory spondyloarthropathy. Id. Because of the possibility of spondyloarthropathy and the presence of Raymond's HLA-B27-related uveitis, Dr. Khairallah suggested treatment with an immunosuppressive agent as well as Sulfasalazine.[9] Id. He also suggested that Raymond obtain x-rays of her back and an extensive rheumatic panel. Id.

Raymond returned to Dr. Khairallah on February 29, 2012. T. 228. Raymond's

---

[7] "Uveitis is inflammation of the uveal tract—the iris, ciliary body, and choroid. Most cases are idiopathic, but identifiable causes include various infections and systemic diseases, many of which are autoimmune." THE MERCK MANUAL at 608.

[8] The HLA-B27 gene "increases the risk of developing ankylosing spondylitis." U.S. NATIONAL LIBRARY OF MEDICINE, GENETICS HOME REFERENCE, https://ghr.nlm.nih.gov/condition/ankylosing-spondylitis (last visited Mar. 4, 2016).

[9] Sulfasalazine delayed-release is "used to treat rheumatoid arthritis in adults and children whose disease has not responded well to other medications." MEDLINEPLUS, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682204.html (last visited Mar. 4, 2016).

rheumatic panel testing revealed an elevated CRP[10] level, but all other readings were within the normal range. Id. The x-rays of her back revealed "probable early erosions of the sacroiliac joints." Id. Raymond reported new pain, radiating down her right hip to her thigh, and described the pain as worse than her left hip pain. Id. Dr. Khairallah noted that she also had right trochanteric bursitis. Id. A musculoskeletal exam showed that she had a full range of motion without any soft tissue swelling and tenderness, except for tenderness in the right trochanteric bursae region, and range of motion limitation in her lumbar spine. Id. A straight leg raise test was negative bilaterally. Id. Dr. Khairallah ordered an MRI of Raymond's sacroiliac joints and prescribed Prednisone. Id.

Raymond had an MRI of her sacroiliac joints on April 4, 2012. T. 326. The MRI revealed "[e]vidence of inflammatory, erosive type sacroiliitis bilaterally, affecting the left sacroiliac joint to a greater degree than the right." Id. Raymond was seen by Dr. Khairallah and April Summerfield, RPA-C, on April 18, 2012. Id. at 227. She was diagnosed with inflammatory spondyloarthropathy with associated positive HLA-B27 status, recurrent uveitis, low back pain, and stiffness. Id. X-rays and the MRI revealed sacroiliac erosion. Id. Raymond also had elevated inflammation markers in her blood. Id. Objective findings revealed "[n]o synovitis, erythema, or warmth to the peripheral joints" and "mildly limited flexion and extension of the lumbosacral spine." Id. She had a full range of motion in her neck. Id. A Faber's test[11] was positive on the left, negative on the right. Id. Summerfield

---

[10] CRP is an abbreviation for C-Reactive Protein. MEDILEXICON, http://www.medilexicon.com/medicalabbreviations.php?keywords=CRP&search=abbreviation (last visited Mar. 4, 2016).

[11] A Faber's test "is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine, and sacroiliac region." PHYSIOPEDIA, http://www.physio-pedia.com/FABER_Test (last visited Mar. 4, 2016).

and Dr. Khairallah planned to authorize Raymond's use of Remicade.[12] Id. Raymond refused a Depo-Medrol injection because she did not believe she needed it at the time. Id.

Raymond was seen by Summerfield on July 11, 2012. T. 320. She reported that she felt that Humira[13] was not helping her condition. Id. Raymond also reported that her back pain was ongoing and that she experienced generalized morning stiffness "all day." Id. She rated her pain level as a six out of ten. Id. Summerfield prescribed Ultram.[14] Id.

Raymond was seen by Dr. Khairallah on August 8, 2012 and was administered Remicade intravenously. T. 317-19. She received Remicade again on August 22, 2012. Id.

On September 19, 2012, Raymond had a follow-up visit with Dr. Khairallah. T. 311-15. Dr. Khairallah noted that Raymond had tried Humira injections for three months without relief, and that she had started Remicade infusions in August 2012. Id. at 311. The first two injections had given her some relief, but her symptoms had returned. Id. She received her third Remicade infusion that day. Id. Raymond rated her pain level as a five out of ten. Id. She also stated that she was experiencing generalized morning stiffness for an hour and a half, but experienced no side effects from the Remicade infusions. Id. An objective examination revealed a full range of motion in all joints, except minimal tenderness in the right trochanteric bursae region and limitation in the lumbar spine. Id. at 312. A straight leg raise test was negative bilaterally. Id. Dr. Khairallah also prescribed Sulfasalazine and

---

[12] "Remicade (infliximab) reduces the effects of a substance in the body that can cause inflammation." DRUGS.COM, http://www.drugs.com/remicade.html (last visited Mar. 4, 2016).

[13] "Humira (adalimumab) reduces the effects of a substance in the body that can cause inflammation." DRUGS.COM, http://www.drugs.com/humira.html (last visited Mar. 4, 2016).

[14] "Ultram (tramadol) is a narcotic-like pain reliever. . . used to treat moderate to severe pain." DRUGS.COM, http://www.drugs.com/ultram.html (last visited Mar. 4, 2016).

advised Raymond to call him if her symptoms worsened.  Id. at 313.

Raymond had her fourth Remicade infusion on November 7, 2012.  T. 305-10.  She reported that her symptoms are "a little better" but she still experienced back pain, which she described as "worse at night."  Id. at 305.  She also reported knee pain when ascending and descending stairs, and generalized morning stiffness for thirty minutes.  Id.  Raymond further reported that she did not take the Sulfasalazine prescribed to her by Dr. Khairallah because of financial concerns, and because she was concerned about taking two immunosuppressants simultaneously.  Id.  An objective examination showed no synovitis of the peripheral joints and her range of motion was "largely intact."  Id. at 307.  Raymond exhibited "some tenderness over the lumbar paraspinals[.]"  Id.

Raymond received another Remicade infusion on December 12, 2012.  T. 304.  She reported that after her last Remicade infusion in November, she experienced headaches and heartburn.  Id. at 300.  She rated her pain severity as a six out of ten, and stated that she felt the Remicade infusions were effective, but not to the extent that she would like.  Id.  An objective examination revealed no synovitis over the peripheral joints, good range of motion of the cervical spine, but mildly limited flexion and extension of the LS spine.  Id. at 302.  Raymond also had generalized paraspinal tenderness in the cervical and lumbar regions.  Id.  Heather B. Machovec RPA-C assessed Raymond's condition as improved with the Remicade infusions, but noted that Raymond experienced generalized pruritis,[15] headache, and reflux following her last Remicade infusion.  Id.  Raymond discussed her symptoms with Dr. Khairallah.  Id.  She was directed to pre-medicate with Claritin prior to

---

[15]  Pruritis is a term for itching.  THE MERCK MANUAL 635.

that day's Remicade infusion, and prior to her next Remicade infusion.  Id.  Solu-cortef[16] was added to her infusion.

Raymond was examined by Summerfield on January 18, 2013.  T. 294-98.  She complained of generalized anthralgias,[17] back and neck pain, and generalized morning stiffness lasting for two hours.  Id. at 294.  She also complained of "positive pain" in both hands and her left knee.  Id.  She rated her pain as a seven out of ten.  Id.  An objective examination revealed limited range of motion of the spine.  Id. at 296.  A Faber's test was negative bilaterally.  Id.  Raymond's left knee exhibited medial joint line tenderness.  Id.  Summerfield noted that she had a "long discussion" with Raymond about her treatment options.  Id.  Raymond "failed Humira" and could not take Enbrel because of her history of uveitis.  Id.  However, Raymond could not afford Remicade.  Id.  Summerfield noted that she would inquire as to whether Raymond qualified for a Simponi trial.  Id.  Summerfield also noted that Raymond had degenerative arthritis in her spine, and that a referral to a pain management physician may be necessary.  Id.  Summerfield prescribed Celebrex[18] to Raymond.  Id.

Raymond had an x-ray performed on her entire spine on January 18, 2013.  T. 299.  The results showed that her cervical, thoracic, and lumbar body heights were all within normal limits.  Id.  There was "[n]o significant interval change in the appearance of the

---

[16]  Solu-cortef "is an anti-inflammatory glucocorticoid that contains hydrocortisone sodium succinate as the active ingredient."  DRUGS.COM, http://www.drugs.com/pro/solu-cortef.html (last visited Mar. 7, 2016).

[17]  Anthralgia is "pain in one or more joints."  MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/arthralgia (last visited Mar. 7, 2016).

[18]  "Celebrex (celecoxib) is a nonsteroidal anti-inflammatory drug (NSAID).  Celecoxib works by reducing hormoes that cause inflammation and pain in the body."  DRUGS.COM, http://www.drugs.com/celebrex.html (last visited Mar. 7, 2016).

spine[,]" but there was "[m]ild indistinctness of the superior sacroiliac joints, suggesting erosions." Id.

Raymond was examined again on February 27, 2013, three weeks after her first Simponi injection. T. 289-91. She stated that she was "feeling much better" and experienced less anthralgias and stiffness. Id. at 289. However, she did report that she was experiencing back and neck pain. Id. Summerfield noted that Raymond appeared to be improving with Simponi, and that she would continue taking that medication. Id. at 290.

Raymond returned to Summerfield on April 24, 2013, and reported that her psoriasis, anthralgias, and low back pain were worsening. T. 285. Raymond also reported back and neck pain. Id. Summerfield assessed Raymond's ankylosing spondylitis as "uncontrolled with increased psoriasis." Id. at 286-87. Summerfield prescribed Methotrexate and folic acid. Id. at 287.


**b. Internal Medicine Examination - Dr. Kalyani Ganesh, M.D.**

Dr. Ganesh examined Raymond on July 11, 2012. T. 268-71. At the time, Raymond reported that she had recently been diagnosed with ankylosing spondylitis. Id. at 268. She reported that she experiences constant, dull low back pain every day. Id. The pain increased with physical activity. Id. She had received five Humira injections thus far, but had not yet experienced relief. Id. She further reported that she experiences recurrent uveitis. Id.

Raymond reported that she had a driver's license, and that even though she was able

to drive, she did not.  T. 268.  Her husband stated that the last time she drove was one month prior.  Id.  Raymond then stated that "she can drive if she really has to."  Id.

Raymond stated that she does not perform any heavy lifting.  T. 268.  She is left-handed.  Id.  She reported that she cooks once per week and cleans twice per week.  Id. at 269.  She showers and dresses every day.  Id.  She also watches the television and reads. Id.

Raymond appeared in no acute distress.  T. 269.  Her gait was normal, and she could walk on her heels and toes without difficulty.  Id.  Her squat was 50% and her stance was normal.  Id.  She did not use an assistive device and needed no assistance changing for the exam or getting on and off the exam table.  Id.  She was able to rise from her chair without difficulty.  Id.

As to an examination of Raymond's musculoskeletal system, Dr. Ganesh offered the following statement:

> Cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  No scoliosis, kyphosis, or abnormality in thoracic spine.  Lumbar spine shows flexion 90 degrees, extension 15 degrees, lateral flexion and rotation 10 degrees. [Straight leg raise] negative bilaterally.  Full [range of motion] of the shoulders.  Right elbow flexion is 130 degrees and left is full, pronation and supination are full bilaterally.  Right wrist dorsiflexion is 15 degrees, palmar flexion is full, radial and ulnar deviation is 0 degrees, left is full.  Cannot extend right elbow all the way.  Also, she only has three fingers on the right hand.  Full [range of motion] of hips, knees, and ankles bilaterally.  No evident subluxations, contractures, ankylosis, or thickening.  Joints stable and nontender.  No redness, heat, swelling, or effusion.

T. 270.  Dr. Ganesh noted that Raymond's hand and finger dexterity was intact, except for

her right hand deformity.  Id.  Although her right hand is smaller than the left, she was able

to perform all fine motor activities.  Grip strength on her right hand was a four out of five,

while the left was a five out of five.  Id.

Dr. Ganesh offered the following Medical Source Statement (MSS) as to Raymond's

abilities: "No gross limitations with sitting, standing, and walking.  There is moderate

limitation with lifting, carrying, pushing, and pulling."  T. 271.  Dr. Ganesh opined that

Raymond's prognosis was fair.  Id.

## II.  Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision.  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is

"'more than a mere scintilla,'" meaning that in the record one can find "'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports the

decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing

Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute

its interpretation of the administrative record for that of the Commissioner if the record

contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d

Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is

conclusive.  42 U.S.C. § 405(g); see Halloran, 362 F.3d at 31.


**B.  Determination of Disability**

"Every individual who is under a disability. . . shall be entitled to a disability. . . benefit

. . . ." 42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not

less than 12 months[.]"  Id. § 423(d)(1)(A).  A medically-determinable impairment is an

affliction that is so severe that it renders an individual unable to continue with his or her

previous work or any other employment that may be available to him or her based upon age,

education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be

supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. §

423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical

facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain

or disability, and educational background, age, and work experience."  Ventura v. Barnhart,

No. 04 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v.

Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)) (additional citation omitted).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to

determine whether an individual is entitled to disability benefits:

First, the [Commissioner] considers whether the claimant is

-14-

currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).


### C. ALJ Smith's Findings

Raymond, represented by counsel, testified at the hearing held on June 11, 2013. T. 30-51. Using the five-step sequential evaluation, the ALJ found that Raymond (1) had not engaged in substantial gainful activity since March 27, 2012, the alleged onset date; (2) had the following severe medically-determinable impairments: congenital deformity of the right upper extremity and ankylosing spondylitis; (3) did not have an impairment, alone or in

combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social

Security Regulation Part 404; (4) maintained

> the residual functional capacity [("RFC")] to perform light work as
> defined in 20 CFR 404.1567(b) and 416.967(b) except she
> retains the use of her right hand to grasp, hold and turn objects
> and can perform occasional fine motor activities with the right
> hand, but she should never climb ladders, ropes and scaffolds,
> and can occasionally climb ramps and stairs, balance, kneel,
> stoop and crawl;

and, thus; (5) given her age, education, work experience, and RFC, was capable of

engaging in employment which exists in significant numbers in the national economy. Id. at

20-26.  Therefore, the ALJ determined that Raymond was not disabled. Id. at 26.


### D.  Raymond's Contentions

Raymond contends that: (1) the ALJ erred by failing to obtain a treating source

opinion regarding Raymond's limitations from Dr. Khairallah; (2) the ALJ failed to include in

her RFC determination work-related limitations consistent with Dr. Ganesh's opinion; (3) the

ALJ failed to consult a a vocational expert at step five of the sequential evaluation; and (4)

the ALJ's credibility determination is not supported by substantial evidence. See Dkt. No.

11.


### 1.  RFC

The ALJ determined that Raymond retained the RFC:

> to perform light work as defined in 20 CFR 404.1567(b) and

416.967(b) except she retains the use of her right hand to grasp, hold and turn objects and can perform occasional fine motor activities with the right hand, but she should never climb ladders, ropes and scaffolds, and can occasionally climb ramps and stairs, balance, kneel, stoop and crawl.

T. 23. In reaching this assessment, the ALJ discussed the notes of Dr. Ramzi Khairallah, M.D., and the opinion of Dr. Kalyani Ganesh, M.D. Id. at 23-25.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150 (citations omitted). RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960. The Second Circuit has clarified that, in step five of the Commissioner's analysis, once RFC has been determined, "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (citing 20 C.F.R. § 404.1560(c)(2)).

**a. Failure to Develop the Record**

Raymond contends that the ALJ failed to fully develop the record by failing to seek a

treating source opinion from Dr. Khairallah regarding Raymond's impairments. Dkt. No. 11 at 15-17. The Commissioner contends that the ALJ fulfilled her duty to develop the record because she based her decision on a complete record. Dkt. No. 12 at 15-17. The Commissioner further argues that the Social Security Administration ("SSA") contacted and received evidence from Dr. Khairallah, and that Raymond's attorney stated at the hearing that the record was complete. Id. at 16. The Commissioner also argues that, because Raymond was examined by various physician assistants at Arthritis Health Associates, and not Dr. Khairallah exclusively, Dr. Khairallah's opinion as to Raymond's limitations would have marginal probative value. Id. at 17-18.

It is well settled that an ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even where the claimant is represented by counsel. See 20 C.F.R. § 404.1512(e) (explaining that the Commissioner will attempt to retrieve the entire medical history from the claimant's treating sources rather than always seek consultative examinations); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citations omitted); see also 20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application . . . ."). Therefore, although Raymond's attorney stated that the ALJ had "all the medical evidence[,]" (T. 32), such a statement does not diminish the ALJ's affirmative duty to develop the record, given the non-adversarial nature of a hearing on disability benefits. Perez, 77 F.3d at 47; see also Geracitano v. Colvin, 979 F. Supp. 952, 956-57 (W.D.N.Y. 1997).

"'The ALJ's duty to supplement a claimant's record is triggered by ambiguous

evidence, the ALJ's finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." Shrock v. Colvin, No. 3:12-cv-1898 (MAD/CFH), 2014 WL 2779024, at *9 (N.D.N.Y. June 19, 2014) (quoting Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citation omitted); see also Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citations omitted)); Calzada v. Astrue, 753 F. Supp. 2d 250, 269-70 (S.D.N.Y. 2010) ("[I]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps . . .").

The ALJ acknowledges in her decision that Dr. Khairallah is Raymond's treating physician.  T. 24.  However, in assessing Raymond's RFC, the ALJ afforded great weight to the opinion of Dr. Ganesh, who examined Raymond once, approximately one year prior to the hearing.  See T. 268-71.  The ALJ's reliance on the opinion of Dr. Ganesh is problematic for two reasons.  First, contrary to the ALJ's conclusion that the treatment records from Dr. Khairallah support Dr. Ganesh's assessment, a more careful reading of the records indicate that they do not.  Second, Raymond was examined by Dr. Khairallah, or by a physician assistant supervised by him, eight times after Dr. Ganesh's examination of her, during which time her symptoms did not improve, or worsened.  T. 285-316.

The ALJ's assertion that Dr. Khairallah's medical records support Dr. Ganesh's assessment is supported only by the ALJ's selective reading of the medical records.

-19-

Raymond was examined by Dr. Khairallah on April 18, 2012, at which time she complained of back pain, hip pain, and stiffness.  T. 227.  She exhibited a full range of motion of the spine, but "mildly limited flexion and extension of the lumbosacral spine."  Id.  An MRI scan revealed sacroiliitis.  Id.  Dr. Khairallah discussed with Raymond the possibility of prescribing Humira or Remicade and Raymond indicated that she would consider which medication she would like to try.  Id.  The ALJ failed to discuss in her decision a medical record dated July 11, 2012 in which Raymond reports to Summerfield that she feels like Humira is ineffective, experiences bodily swelling four times per week, and complains of ongoing back pain and morning stiffness lasting all day.  Id. at 320.  Notably, this office visit occurred on the same date as Dr. Ganesh's examination, where Raymond also reported constant back pain, and that the Humira injections were not working.  Id. at 268.

One month after Dr. Ganesh's examination, on August 8, 2012, Raymond began Remicade infusions.  T. 317-19.  She felt improvement, but reported that the symptoms returned on September 19, 2012.  Id. at 311.  An objective examination revealed a full range of motion in Raymond's joints, minimal tenderness in the right trochanteric bursa region, and limitation in the lumbar spine.  Id. at 312.  On November 7, 2012, Raymond reported that she felt "a little better" but continued to have back pain that is worse at night.  Id. at 305.  She also reported generalized morning stiffness lasting thirty minutes.  Id.

Raymond reported generalized morning stiffness again on December 12, 2012, along with headaches, neck pain, and back pain.  T. 300.  An objective examination revealed good range of motion of the cervical spine, and mildly limited flexion and extension of the LS spine.  Id. at 302.  The examination also revealed generalized paraspinal tenderness in the

cervical and lumbar regions.  Id.

On January 18, 2013, Raymond reported, for the first time, pain in both hands and the left knee, along with back and neck pain.  T. 294.  She also reported generalized morning stiffness for two hours.  She also had a limited range of motion in her spine, and medial joint line tenderness in her left knee, but no active synovitis.[19]  Id. at 296. Summerfield noted that Raymond could no longer afford Remicade, and that she had degenerative arthritis in her spine.  Id.  Summerfield prescribed Celebrex and mentioned that Raymond may need to see a pain management physician.  Id.  Both of those developments indicate that Raymond's condition was deteriorating.

Although Raymond reported that her symptoms were improving after her initial Simponi injection on January 30, 2013, she reported that her condition was worsening on April 24, 2013.  T. 285, 289, 292.  Summerfield assessed Raymond as suffering from "uncontrolled" ankylosing spondylitis and increased psoriasis.  Id. at 287.  She prescribed Methotrexate and folic acid.  Id.

Dr. Ganesh opined that Raymond had "[n]o gross limitations with sitting, standing, and walking[,]" and only "moderate limitation with lifting, carrying, pushing, and pulling[,]" but Raymond's medical records from Arthritis Health Associates indicate that her condition worsened during the year following Dr. Ganesh's opinion, as outlined above.  T. 270. Raymond reported on July 11, 2012 that Humira was not helping her condition.  Id.  at 268. After switching from Humira to Remicade, Raymond reported again on January 18, 2013

---

[19]  Notably absent from the ALJ's discussion is any mention of Raymond's January 18, 2013 treatment note from Arthritis Health Associates, which indicated that Raymond's condition was worsening.

that her condition was worsening, and she exhibited a limited range of motion in her spine. Id. at 296. The status of her ankylosing spondylitis was described as "uncontrolled" on April 24, 2013. Id. at 287. Given that the medical records indicate that Raymond's condition deteriorated between the date that Dr. Ganesh examined Raymond, and the date of the hearing, during which she was examined multiple times for treatment of ankylosing spondylitis, the ALJ's conclusion that Dr. Khairallah's records support Dr. Ganesh's findings is internally inconsistent given the indications in her treatment records that her condition worsened and was difficult to manage.

The ALJ has an affirmative duty to re-contact a treating physician where the record does not contain substantial evidence to support the ALJ's RFC assessment, even if the claimant if represented by counsel. Garcia v. Astrue, 10 F. Supp. 3d 282, 293 (N.D.N.Y. 2012). Although the Commissioner argues that Dr. Khairallah's opinion is unnecessary because the ALJ had a complete medical record on which to base her decision, the cases cited by the Commissioner in support of that assertion are distinguishable. In Whipple, although the ALJ failed to obtain an opinion from the claimant's treating physician, the medical records submitted by the treating physician stated that the claimant was "capable of working" and that his condition was "manageable with medication." Whipple v. Astrue, 479 F. App'x 367, 370 (2d Cir. 2012). Here, Raymond's treatment notes from Arthritis Health Associates make no mention of her ability to work or any work-related limitations. Additionally, Raymond's treatment notes indicate that her ankylosing spondylitis was not well-managed with medication, and her last available treatment note from Arthritis Health Associates characterizes that ailment as "uncontrolled." Likewise, in Tankisi, the Second

-22-

Circuit held that the claimant's case would not be remanded for lack of a formal opinion from a treating physician where the record did include "an assessment of [the claimant's] limitations from a treating physician[.]" <u>Tankisi v. Comm'r of Soc. Sec.</u>, 521 F. App'x 29, 34 (2d Cir. 2013). Here, the medical records from Dr. Khairallah contain neither a formal nor an informal assessment of Raymond's limitations.

The Court is also unpersuaded by the Commissioner's argument that Raymond's "treatment relationship with Dr. Khairallah was not as exclusive as she suggests." Dkt. No. 12 at 17. Dr. Khairallah examined Raymond twice in February 2012, before the alleged onset date. T. 228-30. He examined Raymond with Summerfield, who he supervises, on April 18, 2012. <u>Id.</u> at 227. He examined her in August and September 2012. <u>Id.</u> at 311-193. During Raymond's subsequent visits to Arthritis Health Associates, she was seen by physician assistants, however, the record indicates that Dr. Khairallah was apprised of Raymond's condition, and was involved in her treatment regimen. <u>See</u> <u>id.</u> at 307 (noting that the frequency of Raymond's Remicade infusions would be increased "if Dr. Khairallah agrees"); 302 (noting that Raymond discussed her progress with Dr. Khairallah).

Because Dr. Ganesh's assessment of Raymond's limitations is belied by the treatment notes from Dr. Khairallah, the ALJ should have sought a formal opinion from Dr. Khairallah, as Raymond's treating physician. <u>See</u> <u>Snyder v. Colvin</u>, No. 13-CV-6644T, 2015 WL 3407956, at *5 (W.D.N.Y. May 27, 2015) (noting that the ALJ's duty to develop the record is triggered where the evidence is contradictory). Accordingly, it is recommended that this case be remanded, and that the ALJ be directed to obtain an MSS from Dr. Khairallah.

To the extent that Raymond argues that the ALJ failed to include work-related limitations in her assessment of Raymond's credibility that were consistent with Dr. Ganesh's opinion, (Dkt. No. 11 at 17), the Court need not address this argument, as the RFC assessment may change on remand.

### b. Raymond's Credibility

Raymond argues that the ALJ erred by finding that Raymond's statements concerning the intensity, persistence, and limiting effects of her symptoms to be not entirely credible. Dkt. No. 11 at 18. The Commissioner contends that the ALJ properly evaluated Raymond's credibility. Dkt. No. 12 at 22-26. Because the Court concludes that the ALJ did not fully develop the record, the Court need not address this contention, as the credibility determination may change on remand. However, to the extent that the ALJ, on remand, reassesses the evidence, after requesting an MSS From Dr. Khairallah and applying the treating physician rule, the ALJ should consider whether the reevaluation necessitates a new credibility determination in light of the evidence as a whole.

### c. Step Five Determination

Raymond contends that the ALJ failed to consult a vocational expert at step five in the sequential evaluation, despite the existence of exertional and non-exertional limitations. Dkt. No. 11 at 17. As the Court is remanding to the ALJ for a new assessment of Raymond's RFC, the Court need not address this contention. Upon remand, if determined

to be necessary, following consideration of an MSS from Dr. Khairallah, the ALJ will consult a vocational expert should she determine that Raymond suffers from non-exertional limitations requiring the testimony of a vocational expert.

### III.  Conclusion

**WHEREFORE, IT IS HEREBY**

**RECOMMENDED**, that Defendant's Motion for Judgment on the Pleadings (Dkt. No. 12) be **DENIED**; and it is further,

**RECOMMENDED** that Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 11) be **GRANTED** insofar as the decision of the ALJ be **REVERSED** and this matter **REMANDED** to the Commissioner of Social Security for further proceedings consistent with the above decision; and it is further

**ORDERED**, that the Clerk of the Court is directed to serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **fourteen (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

DATED:    March 14, 2016
            Albany, New York

Christian F. Hummel
U.S. Magistrate Judge